**David DIXON, and all others similarly situated, Plaintiffs–Appellees,**

**and**

**State of New York and Michael J. Dowling, as Commissioner of the New York State Department of Social Services, Intervenors–Plaintiffs–Appellees,**

**v.**

**Donna E. SHALALA, as Secretary of the Department of Health & Human Services, Defendant–Appellant.**

No. 212, Docket 94–6040.

United States Court of Appeals, Second Circuit.

Argued Oct. 12, 1994.

Decided April 19, 1995.

Sapna V. Raj, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., Ping C. Moy and Steven M. Haber, Asst. U.S. Attys., of counsel), for defendant-appellant.

Matthew Diller, of counsel to The Legal Aid Soc., New York City (Helaine D. Barnett, Deputy Atty. in Charge, Scott A. Rosenberg, Acting Director of Litigation, Civil Appeals & Law Reform Unit, Richard E. Blum, of counsel; Rolando T. Acosta, Atty. in Charge, Susan R. Sternberg, of counsel, Brooklyn, NY; Deborah A. Bigel, Stroock & Stroock & Lavan, New York City, of counsel), for plaintiffs-appellees.

G. Oliver Koppell, Atty. Gen. of the State of New York, Mary Fisher Bernet, Asst. Atty. Gen., New York City, for intervenors-plaintiffs-appellees.

Before: OAKES, KEARSE and MINER, Circuit Judges.

OAKES, Senior Circuit Judge:

This appeal involves litigation initiated more than a decade ago on behalf of more than 200,000 claimants whose applications for benefits were denied on the basis of what the trial court found to be systematic and covert misapplication of the disability regulations. Defendant Donna Shalala, Secretary of Health and Human Services (the "Secretary"), appeals from a December 22, 1993, final order (the "Remedial Order") of the United States District Court for the Southern District of New York, William C. Conner, *Judge*, implementing the court's May 8, 1992, opinion and order (the "1992 Opinion"), rendered after trial on a stipulated record. *Dixon v. Sullivan*, 792 F.Supp. 942 (S.D.N.Y. 1992).

Plaintiffs, who were denied disability benefits on the grounds that their impairments were found to be "not severe," brought this class action in 1984 to challenge what they alleged was a policy by the Secretary to heighten the threshold standards for benefits. In the 1992 Opinion, the district court found that the Secretary and Social Security

Administration ("SSA") adjudicators, between June 1976 and July 1983, engaged in systematic and clandestine misapplication of disability regulations concerning "severe" impairments and illegally implemented a policy involving "noncombination" of impairments, causing plaintiffs' disabilities to be classified as "non-severe" and their applications to be denied without full review. Because the court found the agency's misapplication of the regulations to be covert as well as illegal, it concluded that disability claimants could not reasonably have been expected to know of the practice. Consequently, the court equitably tolled the statute of limitations governing appeals of disability denials, allowing claimants to appeal their denials even if they had failed to bring suit within the 60–day statutory period or to exhaust their administrative remedies.

In the Remedial Order, issued after more than a year of subsequent negotiations between the parties, the court retroactively expanded the previously "conditional" plaintiff class in light of the conclusion regarding equitable tolling. As certified in 1984, the class had consisted of claimants whose benefits were denied or terminated pursuant to the severity regulation or the Secretary's noncombination policy after July 20, 1983, 60 days prior to the date of the complaint in this action, as well as claimants whose benefits might be denied or terminated on these grounds in the future. In its Remedial Order, the district court expanded the reach of the class seven years further into the past, to include applicants whose benefits were denied or terminated after June 1, 1976. The court further ordered the Secretary to identify and notify all class members, and to reopen and readjudicate the claims of those who responded. For claimants to whom specified presumptions of disability or nondisability did not apply, the court required the agency to investigate and readjudicate each individual's disability from the earliest possible date of entitlement to the present.

The Secretary raises three issues on appeal. First, she contends, the district court erred in concluding that the Secretary engaged in pervasive and systematic misapplication of the severity regulations from 1976 to 1983. The district court erred secondly, the Secretary contends, in invoking the equitable tolling doctrine to resuscitate the claims of applicants who failed to exhaust administrative remedies or to file suit within the statutorily required period. Third, the Secretary challenges two provisions of the court's Remedial Order: its requirement that the government "reconstruct," as the Secretary characterizes it, files destroyed by the SSA pursuant to regulation; and its requirement that the government readjudicate class members' applications from the earliest possible date of entitlement to the present. These requirements, the Secretary contends, would impose administrative costs of hundreds of millions of dollars on an already overburdened agency and divert scarce resources away from current applicants.

We are painfully aware that no judicial pronouncement may at this late date make whole the hundreds of thousands of disabled individuals who comprise the plaintiff class, and that the choices before us are among perhaps equally unhappy alternatives. After full consideration of the Secretary's contentions, however, we remain unconvinced that the trial court abused its equitable discretion or committed reversible error. Accordingly, we affirm the judgment of the district court in its entirety.

## BACKGROUND

I. *The Statutory and Regulatory Framework*

Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–33 (the Old Age Survivors and Disability Insurance program ("OASDI")), and Title XVI of the Act, 42 U.S.C. §§ 1381–1383d (the Supplemental Security Income program ("SSI")), each provide for the payment of monthly benefits to disabled persons who meet certain requirements. For purposes of both programs, a person will be found disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B) (1988).

The Secretary, acting through SSA, established a five-step "sequential evaluation" process for determining whether a person has a "disability." *See* 20 C.F.R. §§ 404.1520, 416.920 (1994). In an earlier appeal of the action before us, we described the five-step process as follows:

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied. 20 C.F.R. §§ 404.1520(a), (b), 416.920(a), (b) (1983). If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the impairment is "severe," the third step is a decision whether the claimant's impairments meet or equal the "Listing of Impairments" set forth in subpart P, app. 1, of the social security regulations, 20 C.F.R. §§ 404.1520(d), 416.920(d). These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits. If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's "residual functional capacity," *i.e.*, his capacity to engage in basic work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied. 20 C.F.R. §§ 404.1520([e]), 416.920(e). If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." *Decker v. Harris*, 647 F.2d 291, 298 (2d Cir.1981); 20 C.F.R. §§ 404.1520(f), 416.920(f). If not, benefits are awarded.

*Dixon v. Heckler*, 785 F.2d 1102, 1103 (2d Cir.1986) (quoting *City of New York v. Heckler*, 742 F.2d 729, 732 (2d Cir.1984), *aff'd*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986)), *vacated*, 482 U.S. 922, 107 S.Ct. 3203, 96 L.Ed.2d 690 (1987).

### A. *The History of the Severity Regulation*

At issue in the present case is Step Two, commonly known as the "severity regulation," which addresses whether a claimant's impairment is "severe." As with every other step in the five-step evaluation process, failure to meet the disability criteria of Step Two results in denial of benefits with no opportunity to proceed to any later step.

The severity regulation, as amended in 1980, provided:

> If you do not have any impairment(s) which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

20 C.F.R. § 404.1520(c) (1980). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs," such as, for example, "[p]hysical functions such as walking, standing, sitting, lifting, [etc.]", "[c]apacities for seeing, hearing, and speaking," and "[u]nderstanding, carrying out, and remembering simple instructions." *Id.* § 404.1521(b).

Thus, Step Two allows the Secretary to deny a claim for benefits on the basis of a relatively simple threshold determination of the claimant's ability to perform basic, generically defined work functions, without at this stage engaging in the rather more burdensome medical-vocational analysis required by § 423(d)(2)(A) (and applied in steps 4 and 5)—the determination that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The severity regulation has been much analyzed by the courts, and was upheld by the Supreme

Court in a decision discussed below. *See Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

The evolution of the severity regulation, as summarized below, is central to this litigation.

Prior to 1978, the precursor of the severity regulation provided that benefits could be denied on medical evidence alone "where the only impairment is a slight neurosis, slight impairment of sight or hearing, or other similar abnormality or combination of slight abnormalities." *Yuckert,* 482 U.S. at 147, 107 S.Ct. at 2294 (quoting 20 C.F.R. § 404.1502(a) (1961)). The "slight impairment" language was replaced by the non-severity standard in 1978, when the Secretary adopted the five-step process. *See id.* In introducing the amendment from "slight abnormality" to "not severe," the Secretary explained that the change was a "technical clarification," not "intended to alter the levels of severity for a finding of disabled or not disabled on the basis of medical evidence alone." 43 Fed.Reg. 9284, 9296–97 (1978).

In December 1978, several months after the amendment of the severity regulation, SSA issued internal operating instructions in its Disability Insurance State Manual ("DISM"). The DISM contained a list of five medical conditions which, it stated, "represent some examples of the types of impairments which would be considered not severe." DISM § 321B.

In 1980, the severity regulation was slightly amended to its present language. In April 1981, SSA issued a transmittal through its Program Operations Manual System ("POMS") to state adjudicators and quality assurance personnel, expanding the list of "not severe" impairment examples from five to 20. *See* POMS DI § 2102. The POMS stated that adjudicators should consider the examples of medical conditions to be non-severe impairments as long as "no disease or injury other than the condition which is described under these examples is demonstrated." *Id.*

In November 1982, the Secretary issued Social Security Ruling ("SSR") 82–55, which adopted the POMS' list of 20 *per se* "non-severe" impairments. The ruling also instructed SSA adjudicators not to consider the combined effect of impairments at Step Two (the "non-combination policy").

In 1984, Congress passed the Disability Reform Act, which, among other things, required the Secretary to consider the combined effect of impairments. *See Yuckert,* 482 U.S. at 150–51, 107 S.Ct. at 2296. Following the 1984 act, the Secretary issued SSR 85–28, amending her policy for determining non-severity and, among other things, rescinding the list of 20 *per se* non-severe impairments previously published in SSR 82–55.

## II. *Procedural History*

### A. *Pretrial Proceedings*

#### 1. *The Complaint, Preliminary Injunction, and Conditional Class Certification*

This action was commenced in September 1983 by an individual seeking review of his denial of disability benefits. In January 1984, an amended class action complaint was filed challenging the severity regulation. Specifically, the complaint challenged the Secretary's policy of denying or terminating benefits on the basis of non-severity, without consideration of vocational factors such as age, education, and work experience; it also challenged the Secretary's policy of refusing to consider the combined effects of different impairments in determining severity.

By decision dated June 22, 1984, the district court, Morris E. Lasker, *Judge,* granted class certification and a preliminary injunction prohibiting the Secretary from applying the severity regulation and the noncombination policy. *Dixon v. Heckler,* 589 F.Supp. 1494 (S.D.N.Y.1984). The court concluded that the plaintiffs were likely to succeed on the merits of their claim that the severity regulation was invalid both on its face and as applied. *Id.* at 1502–07. The court rejected the Secretary's contention that the regulation was simply a device to screen out *de minimis* claims at an early stage of the evaluation process, a function that would be valid under the Act. *Id.* at 1503. Instead, it concluded, citing the Secretary's own statement, the

severity regulation "*was* intended to 'limit[ ] the number of cases' in which vocational factors would be considered—something which, it would appear, can only be accomplished by increasing the number of cases decided on medical grounds alone." *Id.* at 1504 (emphasis in original). Additionally, the court found the Secretary's noncombination policy "manifestly irrational and [without] support either in logic or in the Social Security Act." *Id.* at 1508.

The court conditionally certified a statewide class consisting of all disability claimants who received final decisions denying or terminating their benefits on the basis of the severity regulation or the noncombination policy no more than 60 days before the filing of the original complaint in the action; that is, after July 20, 1983. *Id.* at 1511–12. The court included as well all claimants whose benefits would be denied in the future pursuant to those policies. *Id.* The court reserved decision as to whether to include claimants whose applications had been denied more than 60 days before the complaint was filed and whose appeals were accordingly time-barred by the 60–day statute of limitations set out in 42 U.S.C. § 405(g). *Id.* at 1511. The issue of equitably tolling the 60–day statutory period, the court noted, was currently on appeal in a different case before this circuit. *Id.* The court, however, waived the requirement that class members exhaust all administrative remedies, on the ground that plaintiffs "ha[d] demonstrated that they will suffer irreparable harm for which *post hoc* relief would be inadequate." *Id.* at 1500–01.

This court affirmed Judge Lasker's preliminary injunction, *Dixon v. Heckler,* 785 F.2d 1102 (2d Cir.1986), and the Secretary filed a petition for *certiorari.* While the appeal was pending, the Supreme Court handed down two decisions which have controlled the subsequent course of this litigation.

#### 2. City of New York *and* Yuckert

First, in June 1986, in *Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), the Court upheld this court's equitable tolling of the Social Security Act's 60–day statute of limitations "[w]here the Government's secretive conduct prevents plaintiffs from knowing of a violation of rights." *Id.* at 481, 106 S.Ct. at 2030 (quoting *City of New York v. Heckler,* 742 F.2d 729, 738 (2d Cir.1984)).

Second, in *Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), a divided Court upheld the Secretary's severity regulation as valid on its face. The Court, in an opinion joined by six justices, held that the Step Two requirement that an applicant make a threshold showing of a severe, medically determinable impairment is consistent with the language and legislative history of the Social Security Act. *Id.* at 154, 107 S.Ct. at 2298. Noting the Secretary's "exceptionally broad authority" to prescribe regulations governing proof of disability, the Court held that the severity requirement is, on its face, consistent with the definition of disability provided in the Act, 42 U.S.C. § 423(d)(1)(A) (defining disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ...."). *Yuckert,* 482 U.S. at 145–54, 107 S.Ct. at 2293.

In a concurrence joined by Justice Stevens, Justice O'Connor, while agreeing that Step Two was facially consistent with the Act's definition of disability, noted that the regulation appeared to have been applied "in a manner inconsistent with the statute"— that is, to deny benefits to claimants who in fact met the statutory definition of disability. *Id.* at 157, 107 S.Ct. at 2299 (O'Connor, *J.,* concurring). Justice O'Connor concluded:

> In my view, step two may not be used to disqualify those who meet the statutory definition of disability. The statute does not permit the Secretary to deny benefits to a claimant who may fit within the statutory definition without determining whether the impairment prevents the claimant from engaging in either his prior work or substantial gainful employment that, in light of the claimant's age, education, and experience, is available to him in the national economy. Only those claimants with slight abnormalities that do not significantly limit any "basic work activity" can be denied benefits without undertaking this vocational analysis.

*Id.* at 158, 107 S.Ct. at 2300. This conclusion was supported by the three dissenting justices. While disagreeing with Justice O'Connor that the severity regulation, as written, could be employed in a manner consistent with the Act, they made clear that they agreed with her that the only valid severity regulation would be one that screened out only *de minimis* claims. *See id.* at 179–80, 107 S.Ct. at 2310–11 (Blackmun, *J.*, dissenting).

### 3. *Post–Remand Proceedings*

In light of its decision in *Yuckert,* the Supreme Court granted *certiorari* in this case and summarily vacated and remanded our affirmance of Judge Lasker's injunction. *Bowen v. Dixon,* 482 U.S. 922, 107 S.Ct. 3203, 96 L.Ed.2d 690 (1987). We summarily remanded the case to the district court for further proceedings in light of *Yuckert. Dixon v. Bowen,* 827 F.2d 765 (2d Cir.1987).

Following remand, the Secretary moved for summary judgment on the ground that *Yuckert* required dismissal of plaintiffs' complaint. Plaintiffs cross-moved for reinstatement of a preliminary injunction. In a letter dated September 17, 1987, the district court ruled that plaintiffs had "made a sufficient threshold showing under *Bowen v. City of New York* ... to justify their entitlement to discovery as to whether a clandestine policy of the Secretary existed which could support a finding that the statute of limitation should be tolled." *See Dixon,* 792 F.Supp. at 945 (quoting the letter ruling). Judge Lasker then recused himself from the case, which was reassigned to Judge Conner.

On November 5, 1987, the district court denied plaintiffs' motion for a preliminary injunction on the ground that, due to changes in the Act and accompanying regulations and policies, plaintiffs had failed to show a likelihood that the Secretary was misapplying, or intended to misapply, the severity regulation. *Dixon v. Bowen,* 673 F.Supp. 123, 128 (S.D.N.Y.1987). The court noted that SSR 82–55 had been rescinded and replaced by

SSR 85–28, which set forth new guidelines for determining the severity of impairments. *Id.* at 128.

Following preliminary discovery, on June 29, 1989, the court denied the Secretary's renewed motion for summary judgment and permitted plaintiffs further discovery. *Dixon v. Bowen,* 126 F.R.D. 483 (S.D.N.Y.1989). The court concluded that "[i]f plaintiffs show that the Secretary applied the severity test in a manner stricter than that set forth in his published regulations, which expressed a policy of using Step 2 to screen out only *de minimis* cases, plaintiffs will have met the requirements of *City of New York* " concerning equitable tolling. *Id.* at 488.

After completing discovery, the parties consented to trial on a stipulated record. Toward this end, they entered into a stipulation as to the documents and deposition testimony that constitute the trial record in this case and stipulated to a number of facts. The district court's decision rendered after this trial (the 1992 Opinion), and its subsequent Remedial Order, constitute the judgment from which the Secretary now appeals.

### B. *The 1992 Opinion and 1993 Remedial Order*

On May 8, 1992, the district court issued its Opinion on an extensive stipulated record, concluding that the SSA had systematically misapplied the severity regulation and that equitable tolling was appropriate. *Dixon v. Sullivan,* 792 F.Supp. 942 (S.D.N.Y.1992). On appeal, we review five aspects of the court's ruling: (1) its finding of systematic agency error following issuance of POMS DI § 2102 (the "POMS") in April 1981 and SSR 82–55 (the "SSR") in 1982 (the "POMS period"); (2) its finding of systematic agency error prior to issuance of the POMS and SSR (the "pre-POMS period"); (3) its finding that the Secretary's noncombination policy was illegal; (4) its use of equitable tolling; and (5) two provisions of the Remedial Order.[1]

---

1. Not challenged on appeal are the court's rejection of several contentions by plaintiffs—that the POMS and SSR were invalid on their face, that they violated the Administrative Procedure Act,

and that they contravened case law requiring that allegations of pain be fully considered. *Id.* at 946–49.

### 1. *Misapplication of the POMS and SSR (after April 1981)*

The court first examined the period after the issuance of the POMS in April 1981 and the SSR in 1982. The court concluded that SSA adjudicators systematically applied the POMS and SSR, in particular their shared list of twenty *per se* non-severe impairments, in a manner inconsistent with the Act. *Id.* at 949. The court concurred with plaintiffs that two kinds of misapplication occurred:

First, ... adjudicators applied the examples to deny claims even when impairments did not match the terms of the examples. Second, ... adjudicators interpreted the instructions as raising the severity standard generally so that even claimants whose claims were not disposed of by the examples received adjudications under an elevated severity standard, resulting in thousands of improper denials.

*Id.*

In reaching this conclusion, the court relied in particular on the following evidence, most of which constitutes admissions of misapplication from within SSA itself:

1. Deposition testimony of Albert Harrison, Deputy Director of the Division of Medical and Vocational Policy in SSA's Office of Disability. Harrison was the drafter of SSR 85–28, which replaced SSR 82–55. In drafting the new ruling, he wrote that the list of twenty specific examples "created an unintended disposition to (erroneously) reach conclusions of not severe." At his deposition, he acknowledged that adjudicators tended to overgeneralize on the basis of the examples. He stated that a consensus emerged at SSA that the examples "were more likely to be misapplied than to give guidance." *Id.* at 949–50.

2. Deposition testimony of Patricia Owens, SSA's former Associate Commissioner for Disability from 1982 to September 1986. Like Harrison, Owens testified that the examples "could be used too literally" and that they probably gave rise to misapplication of the severity regulation. *Id.* at 950.

3. Comments made in 1984 by representatives of SSA's adjudicating components. The district court quoted a SSA regional commissioner, who said the examples "have created problems," and an SSA medical consultant, who called them "one of the most often abused and/or misinterpreted set of guidelines in disability evaluations." *Id.*

4. A 1984 800–case study by SSA concerning implementation of the severity regulation. The study concluded that 37 percent of denials at Step Two were erroneous. (In 22 percent of the Step Two denials studied, applicants were found in fact to have severe impairments; in the other 15 percent, documentation proved inadequate to determine severity.) The 63 percent accuracy rate fell drastically below SSA's target level of 97 percent accuracy, and almost as far below the agency's 90.6 percent accuracy "threshold level," representing the "minimal acceptable level of performance." *Id.* at 950–51.

On the basis of this evidence, the district court concluded that the Secretary's twenty examples of non-severe impairments induced systemic misapplication of the Act. *Id.* at 951.

### 2. *Misapplication of the Severity Regulation Prior to April 1981*

Next, the court examined the period prior to issuance of the POMS in April 1981. Again, the court was convinced by plaintiffs' assertions that even prior to the issuance of the POMS and the SSR, SSA adjudicators systematically misapplied the severity regulation. The agency's issuance of the twenty examples, the court concluded, represented the culmination rather than the beginning of SSA's heightening of the severity standard. *Id.* at 952–56.

The court analyzed the pre-POMS period in two parts: before and after December 1978, when SSA issued internal operating instructions in the DISM to implement the recently promulgated severity regulation. The court found that the DISM, which, among other things, contained a list of five *per se* non-severe medical conditions, "played a role in the misapplication of the severity standard that closely approximates the role played by the POMS and the SSR." *Id.* at

952–53 n. 9. Consequently, the court concluded that the severity standard was systematically misapplied following issuance of the DISM, and it devoted the bulk of its analysis to the period prior to issuance of the DISM. *Id.*

With regard to the pre-DISM period (June 1976 to December 1978), the court relied on the following evidence:

1. Evidence showing that, beginning in June 1976, SSA sent a dramatically increased number of quality assurance returns to state adjudicating agencies urging that applications be denied at Step Two on grounds of "slight impairment." In particular, an affidavit by Marvin Lachman, former Chief Disability Analyst and Director of Quality Assurance at New York's Office of Disability Determinations ("ODD"), attested to the above. Lachman concluded that the quality assurance returns not only increased in volume but also embodied a higher threshold standard. Lachman's affidavit was corroborated by contemporaneous letters and memoranda by ODD officials and representatives of other SSA components around the country, expressing similar concerns. *Id.* at 952.

2. SSA's 1983 Not Severe Impairment Workgroup Report. The report concluded that SSA's application of the minimum-impairment concept fundamentally changed in 1975, although there had been no material change in the Act or regulations. *Id.*

3. Statistical evidence concerning annual Step Two denial rates, showing that denials at this step climbed precipitously in the late 1970s. Step Two denials climbed from 8.4 percent rate of total OASDI denials in 1975, to 24.8 percent in 1977, to 41.6 percent in 1979, and remained at this elevated level into the early 1980s, when the POMS and SSR were issued. (Step Two denial rates of 30 to 40 percent continued through the mid–1980s, and then, after the rescission of SSR 82–55 and issuance of SSR 85–28 in 1985, dropped to about 20 percent. In New York State, the Step Two denial rate dropped below 5 percent following rescission of SSR 82–55.) *Id.* at 953–56.

This combination of statistical evidence and intra-agency corroboration, the court concluded, was sufficient to support a finding of systemic misapplication even before issuance of the POMS and SSR. Relying on the above evidence, the court rejected the Secretary's contention that "the sharp increase in denials reflected nothing more than occasional mistakes of a few adjudicators who misunderstood instructions." *Id.* at 956.

### 3. *The Noncombination Policy*

The court next examined the Secretary's policy, implemented between December 1978 and December 1, 1984, of prohibiting adjudicators from considering the combined impact of non-severe impairments on a claimant's ability to perform work-related functions. The policy was incorporated in the 1978 DISM and later in the SSR, and was abandoned in 1985, pursuant to SSR 85–28. Relying on settled precedent in this and other circuits, the court concluded that the policy violated the Act and resulted in the denial of potentially meritorious claims. *Id.* at 956–57.

### 4. *Equitable Tolling*

Following its analysis of the noncombination policy, the court examined the availability of equitable tolling. As noted above, the Social Security Act requires that a complaint challenging a final decision of the Secretary be filed within 60 days of the claimant's receipt of the decision. 42 U.S.C. § 405(g) (1988). As also above-noted, the Supreme Court, in *Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), held that the 60–day requirement may be waived in a "rare case," according to the traditional principle of equitable tolling, where "the equities in favor of tolling the limitations period are 'so great that deference to the agency's judgment is inappropriate.'" *Id.* at 480, 106 S.Ct. at 2030 (quoting *Mathews v. Eldridge,* 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976)). In the case before it, which, arguably like this case, involved an unpublished SSA policy which resulted in the denial of benefits over an extended period of time, the Court concluded that the government's "secretive conduct prevent[ed] plaintiffs from knowing of a violation of rights," *id.* at 481, 106 S.Ct. at

2031 (quoting *City of New York v. Heckler*, 742 F.2d 729, 738 (2d Cir.1984)), and that accordingly equitable tolling was appropriate.

The district court examined the tolling issue in two parts—first with regard to plaintiffs' misapplication claim, and second with regard to the Secretary's non-combination policy.

In examining the misapplication claim, the court relied heavily on one of its pretrial opinions in which it had rejected the Secretary's attempt to distinguish this case from *City of New York. Dixon,* 792 F.Supp. at 958 (citing *Dixon,* 126 F.R.D. at 487–88). The court rejected as well the Secretary's contention that the widespread misapplication became publicly known through a series of Congressional inquiries. *Id.* at 958–59 & n. 12. The court concluded that, since plaintiffs had "show[n] that the Secretary applied the severity test in a manner stricter than that set forth in his published regulation," plaintiffs had met the requirements for equitable tolling set out in *City of New York. Id.* at 959 (quoting *Dixon,* 126 F.R.D. at 488).

The court then examined the appropriateness of tolling claims concerning the Secretary's noncombination policy, despite its conclusion that the class of claimants denied benefits under that policy was "merely a subset of the class of persons denied benefits pursuant to the Secretary's systematic misapplication of the severity regulation." *Id.* The court concluded that tolling was appropriate for such claims only until 1980, when the policy became embodied in a published regulation, thus losing its clandestine aspect. *Id.* at 960.

### 5. *The Remedial Order*

At its conclusion, the court's 1992 Opinion required the parties to submit proposed orders implementing the court's rulings. After a year-and-a-half of negotiations, resulting in substantial agreement between the parties on most details, the court on December 22, 1993, issued its Remedial Order. *Dixon v. Shalala,* No. 83 Civ. 7001 (WCC) (S.D.N.Y. Dec. 22, 1993). In light of the court's equitable tolling of the Act's 60–day statute of limitations, the Order expanded the previously conditional plaintiff class to encompass those claimants who had been conditionally excluded for failure to file their appeals within the 60–day statutory period. As revised, the plaintiff class consisted of claimants whose applications had been denied, or whose benefits had been terminated, on medical grounds alone between June 1, 1976 and July 19, 1983. Much as it had done nine years earlier, in the 1984 preliminary injunction which was subsequently vacated in light of *Yuckert,* the court ordered the Secretary to identify and notify all class members, and to reopen and readjudicate the claims of those who responded within 90 days.

In order to reduce the staggering task of reopening, reconstructing, and readjudicating a potentially vast pool of claimants, the court, over plaintiffs' objections, employed a scheme of rebuttable presumptions to establish disability or non-disability. *Id.* ¶ 13. With regard to those claimants to whom the presumptions do not apply, the court, over the Secretary's objection, required the agency to evaluate disability from the earliest possible date of entitlement to the present. *Id.* ¶ 11(c). The court also ordered the agency to "use its regular policies on evidence development to assist the class member in obtaining evidence relevant to the readjudication." *Id.* The Secretary contests only these two provisions of the Order.

### DISCUSSION

The Secretary challenges all five aspects of the district court's ruling set out above—its finding of systematic error before April 1981; its finding of systematic error after April 1981, following issuance of the POMS and the SSR; its finding that the noncombination policy was illegal; its employment of equitable tolling; and the provisions of the Remedial Order described above. In reviewing the district court's ruling, we keep in mind that "the Social Security Act is a remedial statute, to be broadly construed and liberally applied." *Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir.1988) (quoting *Gold v. Secretary of Health, Educ. & Welfare,* 463 F.2d 38, 41 (2d Cir.1972)).

I. *Systematic Misapplication of Step Two*

The Secretary contends, first, that the district court erred as a matter of law in finding the SSA's misapplication of Step Two sufficiently pervasive and systemic to justify class relief. The Secretary does not dispute that errors were made; she contends, rather, that the record is insufficient to show that the increase in the rate of Step Two denials was caused by an unspoken agency-wide policy of applying a harsher Step Two standard than that articulated in the regulations. Any increase in Step Two denials, she contends, demonstrates not an agency-wide policy but rather "difficulties on the part of some State adjudicators in applying a fluid standard." Brief for Defendant–Appellant ("Appellant's Br.") at 27.

Pursuant to Fed.R.Civ.P. 52(a), we may not set aside a trial court's findings of fact unless they are clearly erroneous. The district court's findings that SSA adjudicators engaged in a pattern and practice of misapplication of the severity regulation constitute factual findings which we review under this standard. *See Bazemore v. Friday,* 478 U.S. 385, 398, 106 S.Ct. 3000, 3008, 92 L.Ed.2d 315 (1986) (Brennan, *J.,* concurring) (whether plaintiffs proved discrimination is subject to clearly erroneous standard); *Coser v. Moore,* 739 F.2d 746, 750–52 (2d Cir.1984) (applying "clearly erroneous" review to trial court's finding of no pattern and practice of discrimination).

A. *Misapplication Before April 1981*

Following *Wilson v. Sullivan,* 734 F.Supp. 157 (D.N.J.1990), in which the court failed to find a pattern of misapplication by the Secretary after reviewing much of the same evidence, the Secretary challenges the probativeness of the evidence on which the district court relied. In particular, she challenges the evidence summarized above: (1) the Lachman affidavit and supporting memoranda, which noted the sharply increased rate, in 1976, of quality assurance returns urging Step Two denials; (2) the Workgroup Report, which noted a basic change in 1975 in SSA's application of the minimum-impair-

ment concept; and (3) the statistical evidence demonstrating a precipitous rise in Step Two denials in the late 1970s.[2]

The Secretary attempts to dismiss Lachman's affidavit as conclusory, and urges that the corroborating letters, which also expressed concern about what appeared to be an increased Step Two standard, "showed only that there was confusion among adjudicators and that SSA was trying to clarify matters." Appellant's Br. at 30. The Secretary also attempts to cast doubt on the clarity of the Workgroup's conclusions, and attempts to explain away the alarming statistical rise in Step Two denials.

■ We find the Secretary's attempt to cast doubt on the probativeness of plaintiffs' evidence entirely unconvincing. In ruling as it did, the district court carefully distinguished the evidence before it from the evidence before the *Wilson* court and noted that it was able to base its ruling on a far more substantial record. *See* 792 F.Supp. at 953–56. Lachman's conclusions regarding a heightened Step Two standard are supported, the district court noted, by contemporaneous letters and memoranda by other SSA and state officials, which express similar concerns. These conclusions, made by officials charged with carrying out SSA's adjudication policies, are supported by the conclusions of the SSA's own Workgroup, which, unlike the Secretary, we do not find ambiguous, and by overwhelming statistical evidence of a steep rise in Step Two denials. On the strength of this evidence, we cannot find the district court's conclusions clearly erroneous.

B. *Misapplication After April 1981*

The Secretary levels a similar attack on the court's finding of a pattern of Step Two misapplication following issuance of the POMS and SSR. As above, she attempts to cast doubt on the probativity of the main items of evidence relied on by the court—the Harrison and Owens depositions, which critiqued the effect of the POMS' and SSR' twenty examples of non-severe conditions; the similarly critical comments from SSA's

**2.** Following the lead of the district court, the Secretary examines the DISM period in conjunction with the period following the issuance of the POMS and SSR.

adjudicating components; and SSA's 800–case study, which found an error rate of 37 percent (or 22 percent, depending on one's interpretation) in Step Two denials during this period. As above, we do not find the Secretary's evidentiary challenge convincing. Additionally, we think the Secretary has misconstrued the standard which plaintiffs must meet in order to be entitled to class relief.

The POMS and SSR, with their lists of examples, were intended, the Secretary contends, "to clarify the concept of a non-severe impairment and to provide guidance for state adjudicators to follow." Appellant's Br. at 33. The Secretary notes correctly that, as the district court found, the POMS and SSR were facially consistent with the severity regulation and with the Act. She quotes the conclusion of the *Wilson* court: "[t]hat adjudicators misapplied the examples does not tend to show that the Secretary *implemented a policy* to use the examples to increase the number of denials of benefits." *Id.* at 34 (quoting *Wilson*, 734 F.Supp. at 169 (emphasis added)). With regard to the disparaging comments of SSA adjudicating components, the Secretary responds, "that there was robust discussion of the examples actually undercuts the finding of systematic or clandestine misapplication." *Id.* As for SSA's 37 (or 22) percent error rate, the Secretary responds that "errors on the part of state adjudicators do not demonstrate a policy and practice of misapplication *on the part of the Secretary.*" *Id.* at 35 (citing *Wilson*, 734 F.Supp. at 169) (emphasis in original).

The Secretary, thus, admits the existence of widespread error by adjudicators but contends that any error occurred despite her "good faith" efforts to clarify a difficult standard. This line of argument misconstrues the applicable legal standard.

As described above, *supra* pages 11–12, a majority of the *Yuckert* Court concluded that the severity regulation could be valid, if at all, only if applied solely to screen out *de minimis* claims. *See Yuckert*, 482 U.S. at 158, 107 S.Ct. at 2300 (O'Connor, *J.*, concurring, joined by Stevens, *J.*) ("Only those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertak-

ing this vocational analysis"); *id.* at 180, 107 S.Ct. at 2311 (Blackmun, *J.*, dissenting, joined by Brennan and Marshall, *JJ.*) (to be valid under the statute, a threshold determination of severity could "den[y] disability claims only if the medical impairment is so minimal that no set of vocational factors, even if fully considered, could result in a finding of disability"). Since the Court's decision in *Yuckert*, at least seven circuits have followed Justice O'Connor's lead and held that Step Two may do no more than screen out *de minimis* claims. *See Anthony v. Sullivan*, 954 F.2d 289, 294–95 (5th Cir.1992); *Bailey v. Sullivan*, 885 F.2d 52, 56–57 (3d Cir.1989); *McDonald v. Secretary of Health & Human Servs.*, 884 F.2d 1468, 1476–77 (1st Cir.1989); *Hudson v. Bowen*, 870 F.2d 1392, 1395–96 (8th Cir.1989); *Higgs v. Bowen*, 880 F.2d 860, 862–63 (6th Cir.1988); *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir.1988); *Stratton v. Bowen*, 827 F.2d 1447, 1453 (11th Cir.1987). *See also Sullivan v. Zebley*, 493 U.S. 521, 539, 110 S.Ct. 885, 896, 107 L.Ed.2d 967 (1990) (rejecting use of "listings-only" denials of disability claims, in view of Act's requirement of individualized functional analysis of disability).

We find that the record evidence supports the district court's finding that Step Two was employed pervasively during this period to do exactly what the *Yuckert* Court forbade— "to deny benefits to a claimant who may fit within the statutory definition without determining whether the impairment prevents the claimant from engaging in either his prior work or substantial gainful employment that, in light of the claimant's age, education, and experience, is available to him in the national economy." *Yuckert*, 482 U.S. at 158, 107 S.Ct. at 2300 (O'Connor, *J.*, concurring). No more is required to justify class relief. Certainly, plaintiffs are not required to prove that the Secretary acted in bad faith, or covertly, or with an intention to evade the law. Since we concur with Justice O'Connor and the bulk of our sister circuits that the severity regulation is valid only if applied to screen out *de minimis* claims, a finding that it was broadly employed in excess of this function is sufficient to justify class relief, whether or not the evidence demonstrated an

illegal intent on the part of the Secretary. *See State of New York v. Sullivan,* 906 F.2d 910, 916 (2d Cir.1990) (upholding order that disability claims of plaintiff class be readjudicated because SSA, by employing unreliable treadmill test to exclusion of other factors, "clearly transcend[ed] the limits established by Congress"); *City of New York v. Heckler,* 578 F.Supp. 1109, 1125 (E.D.N.Y.1984) (ordering readjudication of claims of plaintiff class in light of SSA's unlawful policy), *aff'd,* 742 F.2d 729 (2d Cir.1984), *aff'd sub nom. Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986).

## II. *The Noncombination Policy*

The Secretary challenges the district court's finding that the Secretary's noncombination policy violated the Act. The court's finding is erroneous, the Secretary contends, because the Act provides that a single severe impairment must be present for disability to be found. *See* 42 U.S.C. § 423(d)(1)(A) (requirement of "any medically determinable physical or mental impairment"); *Yuckert,* 482 U.S. at 148, 107 S.Ct. at 2294 ("[i]f a claimant is unable to show that he has a medically severe impairment, he is not eligible for disability benefits"). She contends, furthermore, that when the 1984 amendments to the Act were enacted, including the provision abandoning the noncombination policy, "Congress recognized that the policy, although not 'realistic,' was nonetheless the 'current law.'" Appellant's Br. at 42 (citing H.R.Rep. 98–618, 98th Cong., 1st Sess. 9, 14 (1984) U.S.Code Cong. & Admin.News 1984, pp. 3038, 3046, 3051.).

■ The Secretary's argument is without merit. As the district court noted, 792 F.Supp. at 956, and as this court has long recognized, the combined effect of a claimant's impairments must be considered in determining disability; the SSA must evaluate their combined impact on a claimant's ability

to work, regardless of whether every impairment is severe. *De Leon v. Secretary of Health & Human Servs.,* 734 F.2d 930, 937 (2d Cir.1984); *Cutler v. Weinberger,* 516 F.2d 1282, 1285 (2d Cir.1975); *see also Johnson v. Sullivan,* 922 F.2d 346, 350–51 (7th Cir.1990) (en banc) (same, and noting also that the 1984 amendment merely clarified the existing requirement that the combined effect of all impairments be considered); *Bailey,* 885 F.2d at 59–61 (same); *McDonald v. Secretary of Health & Human Servs.,* 795 F.2d 1118, 1126–27 (1st Cir.1987) (same). Accordingly, the district court's finding that the noncombination policy violated the Act is affirmed.

## III. *Equitable Tolling*

■ The Secretary next challenges the district court's equitable tolling of the Act's 60–day statute of limitations.[3] We review the district court's equitable tolling for abuse of discretion. *See State of New York v. Sullivan,* 906 F.2d at 917.

### A. *The Misapplication Claim*

The Secretary contends, as she did before the district court, that this case must be distinguished from *Bowen v. City of New York,* in which the Supreme Court affirmed equitable tolling because the government's "secretive conduct prevent[ed] plaintiffs from knowing of a violation of rights," *City of New York,* 476 U.S. at 481, 106 S.Ct. at 2030 (quoting *City of New York v. Heckler,* 742 F.2d 729, 738 (2d Cir.1984)). In this case, the Secretary contends, any misapplication of Step Two was not clandestine. Rather, she urges, SSA engaged in an "open dialogue," both internally and with state agencies, about the difficulties of implementing a severity standard that was "inherently fluid and subject to varying interpretations." Appellant's Br. at 38. Nothing that the Secretary did, she contends, "'prevent[ed] plaintiffs from

---

**3.** The Secretary does not separately challenge the district court's waiver of the exhaustion requirement, but acknowledges that "exhaustion may be excused for the same reasons requiring tolling of the statute of limitations." Appellant's Br. at 37. *See City of New York,* 476 U.S. at 482, 106 S.Ct. at 2031 (concluding that, for claimants for whom expiration of the 60–day period barred further

access to the administrative appeals process, "exhaustion is excused for the same reasons requiring tolling of the statute of limitations"). Accordingly, we conclude that the reasons for which we affirm the district court's equitable tolling are sufficient to affirm its holding that the exhaustion requirement was waived as well.

knowing' of her application of the severity regulation, ... which was evident 'for all to see.'" *Id.* at 39 (quoting *City of New York*, 476 U.S. at 481, 106 S.Ct. at 2030, and *Pittston Coal Group v. Sebben*, 488 U.S. 105, 123, 109 S.Ct. 414, 425, 102 L.Ed.2d 408 (1988)).

As evidence that stricter Step Two review was public rather than clandestine, the Secretary urges: (1) that the change from the "slight" to the "non-severe" concept was broadcast by promulgation of the 1978 severity regulation; (2) that issuance of the POMS and the SSR in 1981 and 1982 broadcast the enhanced standard to the public; (3) that Step Two review practices and standards were the subject of repeated Congressional inquiries and reports from 1974 through the time the complaint in this action was filed in 1984; and (4) that the State of New York, one of the plaintiffs in this action, was aware as far back as 1976 that Step Two denials were increasing. Appellant's Br. at 39.

We must disagree with the Secretary's heroic attempt to distinguish this case from the strikingly similar circumstances of *City of New York*. That case, like this, involved an unpublished SSA policy which resulted in the erroneous denial of disability benefits to a plaintiff class over an extended period of time. As in this case, the policy in question was never published in the Federal Register but was instead implemented through internal memoranda and the quality assurance process. *See City of New York*, 476 U.S. at 473–75, 106 S.Ct. at 2026–27.

We do not find the Secretary's proffered distinctions between the two cases persuasive. First, the Secretary cannot seriously contend that the change from the "slight" to the "non-severe" concept was broadcast by the 1978 severity regulation, when she readily admits that both the 1978 regulation and a subsequent regulation in 1980 "were accompanied by statements that the 'non-severe' standard involved no change from the prior 'slightness' standard." Reply Brief for Defendant–Appellant ("Appellant's Reply Br.") at 14 n. 4 (citing 43 Fed.Reg. 55,358 (1978) and 45 Fed.Reg. 55,574 (1980)).

Second, we cannot agree with the Secretary that issuance of the POMS and the SSR was sufficient to make SSA's heightened

Step Two review available to the public. In *State of New York v. Sullivan*, 906 F.2d at 917, we upheld a district court's equitable tolling despite the Secretary's issuance of a Social Security Ruling concerning the disputed policy during the class period. *See id.* (upholding certification of subclass of claimants who allowed their disability claims to lapse prior to June 10, 1983, despite fact that SSR was issued in January 1983); *accord Hill v. Sullivan*, 125 F.R.D. 86, 95 (S.D.N.Y. 1989) (finding agency's conduct secret despite issuance of an SSR). Equitable tolling was appropriate even after the SSR was issued, we found, because the Secretary had failed to publish the policy, subsequently found to be illegal, in the Federal Register. 906 F.2d at 917. This failure, we concluded, "prevented wide-spread dissemination of that procedure. Plaintiffs therefore lacked the ability to know of the *per se* rules and were entitled to presume that their Government's determination of ineligibility was the considered judgment of an agency faithfully administering the law." *Id.* (citing *City of New York v. Heckler*, 742 F.2d 729, 738 (2d Cir. 1984), *aff'd sub nom. Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), and distinguishing *Pittston Coal Group*, 488 U.S. at 105, 109 S.Ct. at 414–16, in which the Court held equitable tolling inapplicable where "agency action was taken pursuant to regulations that were published for all to see").

We do not intend to suggest that publication by SSR will always be inadequate, or to announce a general rule that failure to publish a policy in the Federal Register will make equitable tolling *per se* appropriate. Rather, as the Supreme Court stated in *City of New York*, our job is to determine whether, on the facts of the case before us, this is one of those "rare case[s]" in which "the equities in favor of tolling the limitations period are 'so great that deference to the agency's judgment is inappropriate.'" 476 U.S. at 480–81, 106 S.Ct. at 2030 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976)). In this case, tolling would appear particularly warranted in light of the district court's finding, 792 F.Supp. at 949–51, that the Secretary's

public statements of policy, the POMS and SSR, were themselves systematically misapplied. As plaintiffs correctly point out, even if a claimant obtained a copy of these documents from the specialized reporters in which they were published,[4] he or she would have no way of knowing that the examples were not viewed by adjudicators as mere illustrations, as the language of the POMS and SSR indicates, but were instead broadly misapplied as fixed rules, with the effect of heightening the severity standard generally.

We are also not persuaded by the Secretary's third contention—that Congressional inquiries into the application of the Step Two standard were sufficient to alert plaintiffs to the illegality of the agency's Step Two practice. First, we are reluctant to place on disability claimants the burden of combing through Congressional hearings in order to discern whether the Secretary is correctly implementing her published regulations. Second, even if claimants in this case had done so, it is by no means clear, as the district court correctly noted, that such scrutiny would have alerted a claimant to the illegality of the agency's heightened Step Two review. *See Dixon*, 792 F.Supp. at 958 n. 12; *Dixon v. Bowen*, 126 F.R.D. 483, 489 (S.D.N.Y.1989).

Lastly, we find entirely unpersuasive the Secretary's argument that equitable tolling is somehow inappropriate because the State of New York was aware as far back as 1976 that Step Two denials were increasing. The fact that the State of New York, which intervened in this action after the class complaint was filed, may have known that Step Two denials were on the upswing certainly did not have the result of bringing the illegality of the Secretary's policy to the attention of the disabled individuals who comprise the class in this action.

In sum, we must reject the Secretary's attempt to distinguish this case from *City of New York*. As we have previously noted, the appropriateness of equitable tolling of the Act's limitations period must be measured in light of the fact that "Congress intended to be 'unusually protective' of claimants in this

area." *State of New York v. Sullivan*, 906 F.2d at 917 (quoting *City of New York*, 476 U.S. at 480, 106 S.Ct. at 2030). We have on more than one occasion rejected the Secretary's contention, advanced again in this litigation, that equitable tolling is permissible "only when the party against whom it is asserted has engaged in some egregious affirmative misconduct." *Id.; accord Canales v. Sullivan*, 936 F.2d 755, 758 (2d Cir.1991) (noting that this circuit has rejected the suggestion, previously advanced in *Wong v. Bowen*, 854 F.2d 630, 631 (2d Cir.1988) (per curiam), that equitable tolling is permissible only in misconduct cases). Reviewing the entire record, we cannot conclude that the district court abused its discretion in equitably tolling plaintiffs' misapplication claims.

**B.  *The Noncombination Policy***

We likewise affirm the district court's equitable tolling of the claims of those persons denied benefits under the Secretary's noncombination policy. As noted above, the court tolled only those claims which were denied or terminated prior to 1980, when promulgation of 20 C.F.R. § 404.1522 (the "noncombination regulation") made the Secretary's noncombination policy public. Prior to issuance of this regulation, the policy was broadcast only in the DISM, the agency's procedural manual, and was accordingly somewhat less widely available than the SSR discussed above. As the Secretary has given us no persuasive reason to treat the equitable tolling issue in this context differently from tolling of plaintiffs' misapplication claims, we cannot conclude that the district court abused its discretion here.

We must, however, respond to one further contention advanced by the Secretary. Noting that the district court tolled only those claims denied or terminated prior to promulgation of the noncombination regulation, the Secretary urges that claims should be considered to have lapsed for those claimants who failed to seek administrative or judicial review within 60 days after the regulation was published. We cannot agree. Particularly in light of Congress's intent to be "unusually

4.  SSRs are published in two Social Security reporters—Commerce Clearing House's Unemployment Insurance Reporter and West's Social Security Reporting Service.

protective" of disability claimants, *City of New York,* 476 U.S. at 480, 106 S.Ct. at 2030 (quoting *Heckler v. Day,* 467 U.S. 104, 106, 104 S.Ct. 2249, 2251, 81 L.Ed.2d 88 (1984)), we will not charge claimants whose disability claims have been denied with an ongoing duty to review all of SSA's amendments to its regulations years after the decisions on their claims. Accordingly, we affirm the district court's equitable tolling of plaintiffs' noncombination claims.

### IV. *The Remedial Order*

Finally, and most powerfully, the Secretary challenges two provisions of the district court's 17–page Remedial Order—its requirement that the government "reconstruct," as the Secretary characterizes it, claims files which SSA destroyed pursuant to its routine document-retention policies; and its requirement that SSA evaluate class members' disabilities from the earliest possible date of entitlement to the present. These requirements, the Secretary contends, impose enormous and unwarranted burdens on the agency, in light of the case's "unprecedented" retroactive reach—involving claims going back almost 20 years—and the size of the class—at least 220,000 potential members, "twice the number of all the other not severe class actions combined." Transcript of proceedings of Nov. 19, 1993, at 16–17.

■ We find these issues to be the most difficult of the issues before us, balancing as they do the benefits potentially owed to more than 200,000 disabled individuals, in some cases up to two decades late, against the potentially staggering cost that full reopening of these claims could impose. As we noted at the outset, this is a situation in which no solution can hope to remedy the harm that has been done and all options are to some extent bad ones. Our review, however, is necessarily a narrow one. We may reverse only if we conclude that the district court abused its equitable discretion in fashioning a remedy. *George Basch Co. v. Blue Coral, Inc.,* 968 F.2d 1532, 1542 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992); *State of New York v. Sullivan,* 906 F.2d at 918.

*The Framework of the Order*

Under the Order, the class conditionally certified by the district court in 1984 was revised, in light of equitable tolling, to include individuals denied benefits, or whose benefits were terminated, between June 1, 1976 and July 19, 1983. Remedial Order ¶ 1. The previously certified class, comprised of claimants who filed claims after July 19, 1983 (and whose claims were accordingly not barred by the 60–day statute of limitations), is thus entitled to relief under the terms of the court's July 25, 1984 preliminary injunction; the new class members are entitled to relief under the new Order. *Id.* ¶ 2.

The Order requires SSA to identify the names, social security numbers, and last known addresses of all identifiable potential class members and to send notice by mail to each individual identified. *Id.* ¶¶ 3, 5. In order to be eligible for readjudication and relief, notified individuals must return the class membership form within 90 days of receipt. *Id.* ¶ 5. Those individuals are then to be screened for class membership by SSA. *Id.* ¶ 9.

The Order requires SSA to "make reasonable efforts to retrieve available, relevant administrative records for purposes of readjudicating the claims of class members." *Id.* ¶ 13. For those class members whose claims files SSA is able to locate, the agency is ordered to reopen and readjudicate their claims from the earliest potential entitlement date through the date of readjudication. *Id.* ¶ 11(a).

If records cannot be located for any class member, either because SSA has destroyed them pursuant to its published file retention schedules, 44 U.S.C. ch. 21, 29, 31 and 36 C.F.R. ch. XII, or SSA is unable to locate them, certain rebuttable presumptions apply, which serve to reduce the number of plaintiffs whose claims must be readjudicated. A class member whose records cannot be located will be presumed to be disabled if he or she received a decision awarding disability benefits for any period of disability subsequent to the one that forms the basis of class membership, and (1) it is medically reasonable to presume that he or she was disabled

as of the date of the prior denial, or (2) he or she was 55 years of age or older at the time of the denial. *Id.* ¶ 13. Conversely, there will be a rebuttable presumption that a class member is *not* disabled if (1) he or she received a denial or termination of benefits subsequent to the one that forms the basis of class membership; (2) he or she was employed for at least six months following the denial or termination; or (3) a claim was reviewed and denied pursuant to a related class action, *Stieberger v. Sullivan*, 792 F.Supp. 1376 (S.D.N.Y.1992). *Id.*

If a class member's claims file cannot be found and the presumptions provided in Paragraph 13 are inapplicable—if, for example, the class member remained unemployed but never reapplied for disability—the class member "will be required to submit evidence pertaining to his or her condition during the period to be readjudicated." *Id.* ¶ 11(c). Paragraph 11(c) contains the two provisions to which the Secretary objects.

### A. The Requirement that SSA "Reconstruct" Lost Files

The Secretary objects, first, to the sentence which immediately follows the above-quoted provision. This provision states:

> SSA *shall also use its regular policies on evidence development* to assist the class member in obtaining evidence relevant to the readjudication of his or her claim.

*Id.* ¶ 11(c) (emphasis added).

This provision, as the Secretary interprets it, would require the agency, at great expense, to "reconstruct" plaintiffs' claims files, some of which are nearly 20 years old and which the agency destroyed pursuant to its published document-retention policies. SSA would be required to apply its regular file-"reconstruction" procedures to the lost or destroyed files. These procedures, as set forth in the POMS, require the agency to interview the applicant, obtain medical releases, contact all physicians, hospitals, and other medical sources; and to do so to the same level of documentation that would be used upon an initial determination. *See, e.g.,* POMS DI § 28035.020. In the event a disability is found, an investigation must be made into the applicant's financial eligibility,

which may include a search for employment and other benefits records.

The Secretary admits that this level of assistance to claimants is appropriate where SSA has, through its negligence or fault, lost claimants' records. Such assistance is not appropriate, the Secretary contends, "with respect to claims for which the agency had no reason to know that it should have retained the files." Appellant's Br. at 50. The Remedial Order, the Secretary contends, would "require[ ] the reconstruction of potentially over 200,000 claims folders—the vast majority of which have been destroyed." *Id.*

In opposition to the "reconstruction" requirement, the Secretary relies on a declaration by Jean Hall Hinckley, the director of litigation in SSA's Office of the Deputy Commissioner for Programs (the "Hinckley Declaration"). According to Hinckley's affidavit, which is uncontroverted by plaintiffs, SSA receives more than eight million new claims each year, two million of which are claims for disability benefits, and spends approximately $910,000 a year to store inactive claims folders. The files of individuals whose claims are denied or terminated and who do not pursue appeals are destroyed pursuant to published schedules. Files for all Title II claims denied or terminated for any reason, as well as Title XVI claims denied or terminated for medical reasons, are destroyed if there has been no appeal or adjudicative action for five years.

In response to numerous successful class action lawsuits filed against the Secretary, in the late 1980s SSA devised a method whereby, "as soon as the scope of a class is known, an alert mechanism is placed in the data systems that normally select cases for destruction." Hinckley Decl. ¶ 7. This alert mechanism blocks the destruction of the claims files of potential class members. The mechanism was in place in time to protect from destruction all the files of the *Dixon* class that was conditionally certified by Judge Lasker in 1984, consisting of claimants whose benefits were denied or terminated after July 19, 1983.

According to Hinckley, however, SSA failed to protect from destruction most of the

files of the subclass certified in the 1993 Remedial Order—persons denied benefits from June 1976 to July 19, 1983—because SSA "had no way of identifying which files were to be retained in order to provide relief to potential class members in this case." *Id.* ¶ 8. Thus, Hinckley reported, the files of "virtually all claims" that were denied or terminated from 1976 to 1979 were destroyed, and "few, if any" files for the 1979-to-1981 period remain. *Id.* Files of claimants denied benefits after October 1981 were protected as a result of another disabilities class action, *Stieberger v. Sullivan,* 792 F.Supp. 1376 (S.D.N.Y.1992).

Reconstruction of the destroyed files, Hinckley states, "would be an extremely complicated and costly procedure":

> It is likely that class members would recall only a small percentage of their past medical sources, if any. Furthermore, those physicians contacted likely would have destroyed records pertinent to class members' past applications for disability and, in many cases, would have no current connection with class members that might help them to recall the nature of their past services. The cost of reconstruction would be enormous and the effort devoted to this activity would have to be diverted from current case adjudication efforts at a time when SSA is experiencing unprecedented workloads.

*Id.* ¶¶ 9–10. The effort, Hinckley concluded, "would waste SSA's extremely limited resources" and "would result in the retrieval of very limited amounts of information." *Id.* ¶ 10.

Plaintiffs respond that the Secretary has mischaracterized the scope and expense of the file "reconstruction" requirement. First, plaintiffs contend, the provision does not require that SSA "reconstruct" the files it has destroyed. Rather, it requires simply that SSA "use its regular policies on evidence development to assist the class member in obtaining evidence." Remedial Order ¶ 11(c); *and see* 11/19/93 tr. at 15–25. These procedures, as described above, would require the agency to interview each claimant whose records had been destroyed and to request medical and employment records from the claimant's doctors and employers. Similar orders have been upheld by other circuits, plaintiffs note, albeit in cases involving fewer plaintiffs and shorter time periods. *See Johnson v. Sullivan,* 714 F.Supp. 1476, 1490 (N.D.Ill.1989), *aff'd in relevant part,* 922 F.2d 346, 355–57 (7th Cir.1990) (en banc); *Hyatt v. Bowen,* 118 F.R.D. 572, 578 (W.D.N.C.1987), *aff'd in relevant part,* 899 F.2d 329 (4th Cir.1990).

Plaintiffs contend, second, that accompanying provisions of the Remedial Order—in particular, the presumptions of Paragraph 13 which the district court included over the objections of the plaintiff class—would reduce the burden on the government to a level far below that claimed by the Secretary. SSA would not have to "reconstruct" 220,000 claims files; rather, it would have to gather evidence only for those class members who are still alive and reachable by the class notice, who respond to the notice, and who are not presumed under Paragraph 13 to be either disabled or non-disabled.

Third, plaintiffs argue that, for those class members who remain and whose records are missing, there is no reasonable alternative to the agency's assisting class members in their attempt to recover lost evidence: without this requirement, claimants whose files have been lost or destroyed will simply be denied relief. As the district court recognized, "[t]he person that is going to suffer because of the lapse of time is the applicant." 11/19/93 tr. at 24.

■ On full consideration, we are not persuaded that the "reconstruction" provision constitutes an abuse of the district court's equitable discretion. As the record makes clear, the provision is a compromise solution which provides plaintiffs with considerably less relief than they sought. *See id.* at 15–19. We do not think the provision requires the agency to go to unreasonable lengths in assisting plaintiffs in gathering records.

We agree with plaintiffs that the provision does not require "reconstruction" of plaintiffs' files, but that SSA must provide reasonable efforts "to assist the class member in obtaining evidence." The provision does not, in our interpretation, require the agency to

reconstruct the names of doctors or medical centers which a particular claimant visited when the claimant is now unable to recall that information. Rather, we read the provision as requiring SSA to contact only those doctors, medical centers, and hospitals specifically identified by claimants. *See* Hinckley Decl. ¶ 9.

More significantly, the provision does not relieve plaintiffs of the ultimate burden of proof. If SSA writes letters to hospitals and doctors requesting records and comes up empty, SSA has discharged its assistance obligation. In such a case, it is the class member, not the government, who loses. As the district court noted, "if [SSA] cannot uncover evidence of disability during the period in question, it simply doesn't pay unless one of the presumptions of paragraph 13 applies." 11/19/93 tr. at 25.

We do not think this is asking too much of SSA. In a situation in which, due to a pervasive pattern of error by the government, it is equitable to toll the statute of limitations, and in which the court has done so, it would be both inconsistent and an exercise in futility not also to require the government to assist in recovering evidence it has destroyed. While the government may have been blameless in destroying some of these files, its pervasive misapplication of the severity regulation, which made tolling necessary, makes this remedy necessary in order for tolling not to be futile. *See City of New York,* 476 U.S. at 487, 106 S.Ct. at 2033 (acknowledging that administrative inconvenience may be unavoidable in equitable tolling cases).

This conclusion has even more force with regard to those files—the majority in this action—the destruction of which SSA could have avoided. We cannot accept the Secretary's contention that SSA was "not able to prevent" the destruction of the great majority of claims files belonging to the plaintiff class.

As noted above, Hinckley stated that SSA failed to protect from destruction most of the files of the subclass certified in the 1993 Remedial Order—persons denied benefits from June 1976 to July 19, 1983—because SSA "had no way of identifying which files

were to be retained." Hinckley Decl. ¶ 8. This is simply not true, however, for those claimants denied benefits after June 1979. If such claimants took no further action, their files would have been destroyed, pursuant to SSA's file-destruction schedule (which, as described above, requires files to be destroyed if there has been no adjudicative action or appeal for five years) no earlier than June 1984, the month in which Judge Lasker issued his decision conditionally certifying a plaintiff class. In his published opinion, Judge Lasker explicitly reserved decision as to whether to include pre-1983 claimants under an equitable tolling theory. *Dixon v. Heckler,* 589 F.Supp. at 1511. This ruling certainly put the Secretary on notice, if plaintiffs' class complaint or its motion for class certification had not, that persons denied benefits from June 1976 on were potential class members, and that destruction of their files might be unwise. Where, as here, the agency's destruction of files was entirely avoidable, we do not think the government should be able to escape the consequences of its actions.

For the reasons set out above, we do not find the district court's evidence-development requirement to be an abuse of the court's equitable discretion. The requirement, a compromise between the requests of plaintiffs and the Secretary, constitutes, we think, a reasonable, balanced response to an admittedly difficult situation.

### B. *The Requirement that SSA Readjudicate Claims up to the Present ("Full Reopening")*

The Secretary, secondly, challenges the provision which immediately follows the file-reconstruction requirement. This provides:

SSA will readjudicate the [class member's claims] from the class member's earliest potential entitlement (based upon the application which resulted in class membership) through the date of the last administrative denial or termination. *SSA shall also consider all subsequent periods,* except that disability for any period which was the subject of a disability determina-

tion rendered after July 25, 1984 need not be considered.

Remedial Order ¶ 11(c) (emphasis added).

The Secretary does not object to most of the language quoted above. She challenges only the emphasized phrase, as well as identical language contained in Paragraph 11(a) of the Order, which she characterizes as an "enormous and unprecedented grant of relief." Appellant's Br. at 45. The provision to which the Secretary objects—which has been characterized as "full reopening" of claims—would require SSA to readjudicate a class member's application not only as of the time it was denied, but up to the date of readjudication, even if that person never filed another claim for benefits. The Secretary does not object to awarding benefits up to the date of adjudication for someone whom SSA finds to have been disabled as of his or her original application, and who has continued to be disabled; she does object, however, to the requirement that SSA examine the entire record, from as far back as 1976 to the present, for someone who is found to have been non-disabled in 1976 and who never filed another claim. To award benefits to such a plaintiff, would, the Secretary contends, constitute an unjustified windfall for plaintiffs.

Awarding such "full reopening" of claims, the Secretary contends, would be inconsistent with SSA's regulations, which limit relief for Title II benefits to the 12 months prior to the date of application, and relief for Title XVI benefits to the month of application. *See* 20 C.F.R. § 404.316(a) (Title II) (1994); *id.* § 416.501 (Title XVI). The Secretary contends as well that this provision goes beyond the relief ordered in other Step Two class actions. *See State of New York v. Sullivan*, 906 F.2d 910, 919 (2d Cir.1990) (affirming remedial order which awarded full reopening of claims only to those class members who continued to file appeals or reapplications while the class action was pending); *cf. Johnson v. Sullivan*, 922 F.2d 346, 356–57 (7th Cir.1990) (en banc) (approving full reopenings to class members, even where they failed to file additional applications). In addition, the Secretary contends, pre–1983 claimants would also receive better treat-

ment than did post–1983 claimants who were included in the 1984 class certification. At a minimum, the Secretary contends, we should reverse the Remedial Order to the extent that it requires SSA to consider periods subsequent to the denial of the application on which class membership is based, where that denial took place prior to the commencement of the class action.

■ We cannot agree. Although the question is a close one, we are unable to conclude that the district court's order constitutes an abuse of discretion.

First, we find compelling plaintiffs' contention that, because SSA has destroyed most class members' files, consideration of evidence for periods after claimants' original denials is essential. Having destroyed these records—many of them after being put on notice that they were potential class records—SSA cannot reasonably expect to limit relief to the now-undocumented period of the original denials.

Second, as plaintiffs note, the district court considered and expressly rejected the Secretary's contention that disabled claimants should have to keep reapplying "year after year even though they're turned down." 11/19/93 tr. at 28. As the Supreme Court commented in *City of New York v. Bowen* with regard to equitable tolling:

All of the class members who permitted their administrative or judicial remedies to expire were entitled to believe that their Government's determination of ineligibility was the considered judgment of an agency faithfully executing the laws of the United States. Though they knew of the denial or loss of benefits, they did not and could not know that those adverse decisions had been made on the basis of a systematic procedural irregularity that rendered them subject to court challenge.

476 U.S. at 480–81, 106 S.Ct. at 2030 (quoting *City of New York v. Heckler*, 742 F.2d 729, 738 (2d Cir.1984)). We find the Court's comment pertinent to the circumstances before us. Class members who were subjected to the misapplication of the severity policy could not be expected to reapply repeatedly when they had already been told by SSA that their

claims were unmeritorious and they had no reason to know that illegal standards had been applied.[5]

Finally, we cannot agree with the Secretary's contention that an award of full reopenings would be inconsistent with SSA regulations. This issue was fully addressed by the Seventh Circuit, sitting *en banc*, in *Johnson*, 922 F.2d at 356. Under SSA regulations, the *Johnson* court reasoned, claimants' applications for disability benefits remain in effect until they receive a final administrative determination. *Id.* (citing 20 C.F.R. §§ 404.620, 416.330). Where a final administrative determination is deferred by the pendency of a class action, the court concluded, "the plaintiffs' initial applications remain 'in effect,' and each of these plaintiffs must be awarded retroactive benefits for any disability occurring after the date of application." *Id.; see also Marcus v. Sullivan*, 926 F.2d 604, 616 (7th Cir.1991) (affirming full reopening of claims); *cf. State of New York v. Sullivan*, 906 F.2d at 919 (district court was within its equitable discretion to award only partial reopening to class members who did not appeal or reapply during pendency of the class action).

We are unconvinced by the Secretary's attempt to distinguish this case from *Johnson*. In *Johnson*, the Secretary notes, the court approved full reopenings to class members, even where they failed to file additional applications, on the theory that "[o]nce this class action began, each member of the plaintiff class ... had a reasonable expectation that his claim would be satisfied by this litigation". 922 F.2d at 356. The Secretary notes, correctly, that the class of *Dixon* plaintiffs certified in 1993 (who received denials before July 1983) let their applications lapse *before* the filing of the class action; accordingly, she contends, in letting their claims lapse they could have not been relying on the same "reasonable expectation" on which *Johnson* class members relied.

While the Secretary's distinction is undeniable on its face, we cannot agree with the conclusion she would have us draw from it. As plaintiffs point out, the claims of *Dixon* class members, like those of the *Johnson* class, *are* "live" claims (albeit retroactively), because the statute of limitations has been equitably tolled and the exhaustion requirement waived. As the *Johnson* court affirmed, if a claim is before the court on judicial review, the application remains in effect. *Id.* Contrary to the Secretary's urging, we can see no reason why this conclusion should be inapplicable where plaintiffs have relied on equitable tolling or waiver of the exhaustion requirement. *See City of New York*, 476 U.S. at 480–81, 106 S.Ct. at 2030 (discussing reasons for equitable tolling). Accordingly, we cannot find the district court's requirement of full reopenings to be an abuse of discretion.

## CONCLUSION

In conclusion, we affirm the judgment of the district court in its entirety. As the Supreme Court observed in *City of New York*, 476 U.S. at 487, 106 S.Ct. at 2034, "we are aware that administrative inconvenience may result from our decision today. But the Secretary had the capability and the duty to prevent the illegal policy found to exist by the District Court. The claimants here were denied the fair and neutral procedure required by the statute and regulations, and they are now entitled to pursue that procedure."

---

5. We note in this regard that we do not read the Order as requiring SSA to consider subsequent periods of disability caused by ailments unrelated to the disability which provided the basis for a claimant's original disability application. Rather, in our understanding, the Order requires the agency to consider "all subsequent periods" of disability that can reasonably be said to be related to the original disability for which the class member was denied benefits. This conclusion is not only supported by common sense but is consistent with the discussion of *Johnson v. Sullivan* which follows.